UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

JAMES ALLAN FRY, JR.,   :     No. 3:23-CV-1561
                         :
      Plaintiff     :     (Caraballo, M.J.)
                         :
     v.             :
                         :
FRANK J. BISIGNANO,[1]  :
Commissioner of Social    :
Security Administration,    :
                         :
      Defendant     :

## <u>MEMORANDUM</u>

Pending before the Court is the appeal by Plaintiff James Fry, Jr.,
of the decision by the Commissioner of Social Security Administration
("the Commissioner") to deny his application for disability benefits.  For
the reasons set below, the Commissioner's decision is affirmed.

## I.   <u>Introduction</u>

Fry seeks judicial review of the Commissioner's final decision to
deny his application for disability benefits under Title II of the Social

---

[1]  Frank Bisignano was confirmed as the Commissioner of the Social Security
Administration on May 6, 2025. Pursuant to Federal Rule of Civil Procedure 25(d)
and 42 U.S.C. § 405(g), Frank Bisignano is substituted as the defendant in this suit.

Security Act.  The Court has jurisdiction pursuant to Title 42, United States Code, Section 405(g).

Fry challenges three alleged errors that Administrative Law Judge ("ALJ") Randy Riley committed when determining that he was not disabled under the Social Security Act.  Namely, Fry claims that the ALJ: (1) failed to find as persuasive the medical opinions provided by Fry's longstanding psychiatrists, Drs. Robert Anderson and Emily Stetler, and to explain the reasons for deeming certain parts of their testimonies persuasive or unpersuasive;[2] (2) lacked substantial evidence in concluding that Fry can engage in medium work for the durational period, and thus substantial gainful activity; and (3) failed to account for the opinions provided by Drs. Anderson and Stetler in the hypotheticals provided to the vocational expert.  Doc. 8 at 3, 16–18.  The matter is fully briefed and ripe for decision.

As explained below, ALJ Riley's conclusion on each of the challenged issues was supported by substantial evidence in the record,

---

[2] Two of Fry's purported challenges involve ALJ Riley's alleged failures to (1) find as persuasive the opinions of Drs. Anderson and Stetler, and (2) explain the reasons for accepting or rejecting certain parts of the two physicians' opinions.  Doc. 8 at 3. As these two issues involve the same standard and discussion, this Memorandum addresses them simultaneously.

coupled with sufficient reasoning to permit meaningful judicial review. Accordingly, the Court affirms the Commissioner's decision to deny Fry's claim for social security disability benefits.

## II.    **Background**

On March 31, 2019, Fry applied for social security disability benefits, alleging complete disability from his obsessive-compulsive disorder ("OCD"), depression, and anxiety. Tr.[3] 109. The Social Security Administration ("SSA") denied Fry's application on August 20, 2019. *Id.* at 166–69. Fry requested reconsideration, but his application was denied again on January 29, 2020. *Id.* at 170–74. Fry accordingly requested a hearing on February 10, 2020. *Id.* at 181–82. The SSA granted the request and held the first administrative hearing. *Id.* at 143.

The initial hearing, held on July 28, 2020, concerned whether Fry was disabled within the meaning of the Social Security Act from March 29, 2019, through December 31, 2024—the last date Fry was eligible to receive social security disability insurance. *Id.* at 143, 145. ALJ Riley

---

[3] The administrative record, referred to herein as "Tr.," encompasses Docs. 7, 7-1, 7-2, 7-3, 7-4, 7-5, 7-6, 7-7.

evaluated clinical records, medical history, medical expert reports, vocational expert testimony, and Fry's own testimony. *Id.* at 45–73. Among the received evidence was a record of an internal medicine examination by Drs. Anderson and Stetler, both dated July 20, 2020. *Id.* at 45, 1065–69 (Anderson), 1090–99 (Anderson), 1103–49 (Stetler), 1150–53 (Anderson).

On August 5, 2020, ALJ Riley issued a decision concluding that Fry was not disabled between the operative dates of March 29, 2019, through the date of the decision. *Id.* at 140–54. Relevantly, in his discussion of Fry's residual functional capacity, ALJ Riley failed to include an adequate discussion of conflicting evidence provided by Drs. Anderson and Stetler.

On November 4, 2021, the SSA's Appeals Council granted Fry's request for review for two reasons. *Id.* at 161–63. First, ALJ Riley failed to adequately discuss the opinions provided by Drs. Anderson and Stetler. *Id.* at 161. Second, while the ALJ relied on the vocational expert's testimony to find that Fry was able to work as a cleaner or a laundry worker, those positions require "constant exposure to humidity," which the residual functional capacity, as defined by ALJ

Riley, precluded. *Id.* at 162. The Appeals Council thus remanded. *Id.* at 163.

The consequent remand hearings, over which ALJ Riley also presided, took place on March 1, 2022, *id.* at 77–98, and May 19, 2022. *Id.* at 101–08. At the hearing, the ALJ received additional evidence of record, including Fry's new clinical records, medical history and expert reports, and vocational expert testimony. *Id.* at 77–98, 101–08. During the hearing of May 19, 2022, the ALJ, based on Fry's testimony and other evidence, asked Sheryl Bustin, another vocational expert, to assume

> a person the Claimant's age, education, and work experience is able to do the following. Medium work. Frequent climbing of ramps, stairs, balance, stoop, kneel, crouch, crawl. Occasional climbing of ladders, ropes, scaffolds. Avoid exposure to extreme cold, humidity, irritants, hazards such as heights and machinery. Work is limited to simple, routine, repetitive tasks involving only simple work-related decisions with few, if any, workplace changes, and occasional supervision.

*Id.* at 103. Bustin confirmed that such an individual could only work as a warehouse worker—the only unskilled occupation. *Id.* Then, ALJ Riley asked whether there were any positions with medium or light work that met those limitations. *Id.* at 104. Bustin responded that

5

such a person may perform occupations with medium work requirements as a machine feeder or a dining room attendant, or with light work requirements as a small products assembler. *Id.*

Following the response, the ALJ asked the vocational expert to also consider a scenario in which the hypothetical individual "cannot engage in sustained work activity on a regular continuing basis for eight hours a day, five days a week, for a 40-hour workweek." *Id.* Bustin confirmed that such a person cannot perform any of the past jobs or any other jobs in the national economy. *Id.* at 105.

On June 13, 2022, the ALJ issued his second decision, again concluding that Fry was not disabled between the operative dates of March 19, 2019, through December 31, 2024. *Id.* at 9–34. ALJ Riley reached that conclusion by employing a five-step analytical process required under the Social Security Act to evaluate disability insurance and supplement security income claims. *See* 20 C.F.R. § 404.1520(a)(4).

The process requires sequential consideration of: (1) whether the claimant is engaged in substantial gainful work activity; (2) the medical severity of the claimant's impairments; (3) whether the impairment meets or equals a defined list of impairments; (4) a comparison between

the claimant's past relevant work and residual functional capacity, i.e.,
the most work that a claimant can perform despite his or his
limitations, *see id.* § 404.1545(a); and (5) an assessment of the
claimant's residual functional capacity and his or his age, education,
and work experience. *Id.* § 404.1520(a)(4)(i)–(v).  Should a claimant
proceed past the first three steps, the Commissioner will not find the
claimant disabled when he or he can perform past relevant work under
the third step or adjust to other work under the fourth step. *Id.*
§ 404.1520(a)(4)(iv)–(v), (f), (g).

Applying that analysis, the ALJ first determined that Fry met the
insurance requirements of the Social Security Act, *see id.* § 404.130,
through December 31, 2024.  Tr. 15.  ALJ Riley also found that Fry did
not engage in substantial gainful activity since his alleged disability
onset date of March 29, 2019.  *Id.*

At the second step of the analysis, the ALJ found that Fry suffered
from three severe impairments: asthma, allergic rhinitis, obesity, major
depressive disorder, generalized anxiety disorder, OCD, and post-
trauma stress disorder ("PTSD").  *Id.* at 15–16.  At the same time, ALJ
Riley determined that hypertension, vertigo, right pulmonary module,

7

and hepatic steatosis "poses more than a minimal limitation" upon Fry's ability to perform basic work activities, and thus found that they were non-severe. *Id.*

Moving to the third step of the analysis, the ALJ determined that Fry's impairments failed to meet or medically equal one of the impairments listed in the SSA's regulations. *Id.* at 16.

Accordingly, the ALJ proceeded to determine Fry's residual functional capacity before addressing the final two steps in the sequential analysis. ALJ Riley noted that "the statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" Tr. 20. Based on the medical evidence of record, the ALJ concluded that:

> the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that he is capable of frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching and crawling and occasional climbing of ladders, ropes and scaffolds. The claimant must avoid exposure to extreme cold, humidity, irritants and hazards such as heights and machinery. The claimant retains the mental capacity to perform simple, routine, repetitive tasks involving only simple work[-]related decisions with few, if any, work place changes and to tolerate occasional supervision.

*Id.* at 19.

In reaching that residual functional capacity determination, ALJ
Riley considered three bodies of evidence germane to this
Memorandum. First, the ALJ considered Fry's own statements
provided to various medical provides. Some of the relevant statements
include the following:

> At a mental health assessment on November 5, 2019, the
> claimant's memory appeared intact (Exhibit 9F). . . . The
> claimant's cognition appeared normal at earlier appointments
> with that provider (Exhibit 8F). . . . [T]he claimant has his
> driver's license, and he leaves the home to shop, to participate
> in the radio club, to go to church and to go to the homes of
> family members and friends (Exhibit 3E, 4E). . . . On
> November 22, 2019, the claimant reported that his wife had
> allowed him to go to a radio get together (Exhibit 10F). The
> claimant reported on August 26, 2020 having spoken at a
> meeting at church (Exhibit 14F). On June 25, 2021, the
> claimant reported having gone to the beach a couple of weeks
> before (Exhibit 15F). . . . On September 2, 2020, the claimant
> reported watching the dogs of his in-laws (Exhibit 14F). On
> October 30, 2020, the claimant reported looking forward to
> dog sitting for his brother-in-law (Exhibit 14F). The claimant
> reported on August 26, 2020 having spoken at a meeting at
> church (Exhibit 14F). . . . [B]y June 12, 2020, the claimant
> reported to his primary care provider that the supplements
> suggested by his psychiatric provider seem to help a lot such
> that he hardly is using Diazepam at all (Exhibit 8F).

*Id.* at 17–22.

Second, ALJ Riley evaluated the persuasiveness of the medical

opinion provided by Dr. Anderson in determining the limitations

imposed by Fry's mental impairments.  He specifically considered the

physician's assessment that Fry

> has no useful ability to function in performing activities
> within a schedule, working near others without distraction,
> responding appropriately to changes in the work setting and
> traveling in unfamiliar places; is able to perform satisfactory
> some of the time in remembering locations and work like
> procedures, maintaining attention and concentration for
> extended periods, sustaining an ordinary routine, making
> simple work relate decisions, completing a normal workday or
> week, performing at a consistent enough pace and setting
> realistic goals; is satisfactory most of the time in
> understanding and remembering simple and detailed
> instructions, carrying out detailed instructions, interacting
> appropriately with the public, asking simple questions,
> responding appropriately to criticism from supervisors,
> getting along with coworkers and maintaining socially
> appropriate behavior; and has no limitation in carrying out
> simple instructions or adhering to basic standards of
> neatness.  This provider indicated that the claimant's
> symptoms would cause him to miss work more than two (2)
> days per month (Exhibit 16F).  On July 20, 2020, this provider
> indicated that the claimant has no useful ability to function
> in maintaining attention and concentration for extended
> periods, performing activities within a schedule, completing a
> normal workday or week, performing at a consistent pace,
> responding appropriately to changes in the work setting,
> traveling in unfamiliar places and setting realistic goals; is
> able to perform satisfactorily some of the time in
> understanding and remembering detailed instructions,
> working without distraction, making simple work related
> decisions and asking simple questions; is able to perform

> satisfactorily most of the time in carrying out detailed instructions, sustaining an ordinary routine, interacting appropriately with the public, accepting criticism from supervisors, getting along with coworkers, maintaining socially appropriate behavior, adhering to basic standards of neatness and being aware of hazards in the work place; and no limitation in understanding, remembering or carrying out instructions (Exhibit 12F). This provider indicated that symptoms would cause the claimant to miss work more than two (2) days per month (Exhibit 12F).

*Id.* at 27–28. At the same time, the ALJ deemed Dr. Anderson's conclusions regarding Fry's "inability to perform . . . at a competitive level" unpersuasive due to lack of "documentation of inpatient psychiatric hospitalization" or "a partial hospitalization or intensive outpatient program or emergency treatment"; unwillingness and failure to "take medications" and "fill prescriptions"; Fry's admission that "he hardly has been using Diazepam"; presence of "situational stressors"; and psychiatric treatment notes observing attention and memory and improvements. *Id.* at 28.

Third, ALJ Riley evaluated the persuasiveness of the medical opinion of Dr. Stetler in determining the limitations imposed by Fry's mental impairments. He specifically addressed Dr. Stetler's indication that,

on February 16, 2022 . . . the claimant has no useful ability to function in understanding, remembering and carrying out simple and detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, sustaining an ordinary routine, making simple work related decisions, completing a normal workday and week, performing at a consistent enough pace, asking simple questions, responding appropriate to criticism from supervisors, responding appropriately to changes in the work setting, traveling in unfamiliar places and setting realistic goals; is able to perform satisfactorily some of the time in remembering locations and work like procedures, working near others without distraction, getting along with coworkers, maintaining socially appropriate behavior and being aware of normal hazards; is able to perform satisfactorily most of the time in interacting appropriately with the public and adhering to basic standards of neatness.  This provider indicated that the claimant likely would miss work more than two (2) times per month due to symptoms and at least weekly would be required to miss work due to panic attacks (Exhibit 17F).  On November 12, 2021, this provider indicated that the claimant is not able to make decisions or to work (Exhibit 19F).  On September 10, 2021, this provider indicated that OCD prevents the claimant from performing simple household chores (Exhibit 19F).  On March 5, 2021, this provider indicated that the claimant's depression renders him unable to work or to perform tasks (Exhibit 14F).  On July 17, 2020, this provider indicated that the claimant has no useful ability to function in understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine, performing activities within a schedule, making simple work related decisions, completing a normal workday or week, performing at a consistent pace, accepting criticism from supervisors, responding appropriately to changes in the work setting and setting realistic goals; is able to perform satisfactory some of the time in remembering work like procedures, understanding, remembering and carrying out

simple instructions, working without distraction, asking simple questions and getting along with coworkers; is able to perform satisfactorily most of the time in carrying out detailed instructions, maintaining socially appropriate behavior, being aware of normal hazards and traveling in unfamiliar places; and has no limitation in interacting appropriately with the public or adhering to basic standards of neatness. This provider indicated that the claimant would miss work more than two (2) times per month due to symptoms (Exhibit 11F). On July 17, 2020, this provider indicated that the claimant is unable to meet the demands of any regular employment at this time with severely hampered ability to meet productivity standards, to manage conflict or to accept criticism and to work collaboratively (Exhibit 10F). On July 17, 2020, this provider indicated that difficulty regulating would make employment untenable (Exhibit 14F). On July 1, 2020, this provider indicated that the claimant could not sustain attention to perform work related tasks (Exhibit 14F). On June 26, 2020, this provider indicated that the claimant would be very suspicious of a supervisor at work (Exhibit 14F). On June 10, 2020, this provider indicated that the claimant would not be able to perform work duties (Exhibit 10F). On May 27, 2020, this provider indicated that the claimant would be unable to focus or function at a job (Exhibit 10F). On May 10, 2020, this provider indicated that work would be nearly impossible (Exhibit 10F). On April 24, 2020, this provider indicated that work virtually is impossible at this point (Exhibit 10F). On April 10, 2020, this provider indicated that depression and anxiety continue severely to impact the claimant's functioning (Exhibit 10F). On March 4, 2020, this provider indicated that the claimant would have extreme difficulty with a job (Exhibit 10F). On October 1, 2019, this provider and David Haynes-Weller, Psy.D., Dr. Stetler's supervisor, indicated that the claimant would be unable to hold a job due to his mental health symptoms (Exhibit 5F).

*Id.* at 29–30.

13

At the same time, ALJ Riley, examining the opinion's supportability and consistency, determined that "the severity of symptoms reported by the claimant to this provider are not entirely consistent with the claimant's presentation at appointments during similar periods of time with his primary care provider." *Id.* at 30.

Based on these medical records, and other things, ALJ Riley deemed Fry capable of medium work. *Id.* at 19. Subsequently, having determined Fry's residual functional capacity and rejected several grounds for further limitation, the ALJ proceeded to the fourth step of the analysis to determine whether he was disabled within the meaning of the Social Security Act. *Id.* at 32–34. Here, ALJ Riley compared Fry's past work and residual functional capacity, finding that he was unable to perform his prior employment as a dispatcher operator, a store laborer, a delivery driver, and a dump truck driver. *Id.* at 32.

Finally, in the fifth step of the sequential analysis process, ALJ Riley considered Fry's age, education, work experience, and residual functional capacity to perform medium work, concluding that Fry "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." *Id.* at 32–34. Here, the

ALJ leveraged testimony provided by Bustin that a person fitting Fry's parameters could meet the requirements of a store laborer, a machine feeder, a dining room attendant, or a small products assembler. *Id.* at 32–33. "Pursuant to SSR 00-4p, . . . the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles." *Id.* at 33.

As a result of this analysis, ALJ Riley determined that Fry was not disabled and denied his application for disability benefits. *Id.* at 9–11. Fry unsuccessfully appealed the denial to the SSA's Appeals Council. *Id.* at 1–3. The instant appeal to the District Court followed.

Fry initiated this action with the Court on September 19, 2023. Doc. 1. The Commissioner provided the requisite transcripts from the disability proceedings on November 15, 2023. Docs. 6–7. The parties then filed their respective briefs. Docs. 8; 12; 16.

Fry alleges three errors warranting remand. Doc. 8 at 3, 16–18. Namely, Fry alleges that the ALJ: (1) failed to find as persuasive the medical opinions provided by Drs. Anderson and Stetler, and to explain the reasons for accepting certain parts of their testimonies and rejecting others; (2) lacked substantial evidence in concluding that Fry can

engage in medium work for the durational period, and thus substantial gainful activity; and (3) failed to account for the opinions provided by Drs. Anderson and Stetler in the limitations provided to vocational expert Bustin. *Id.*

## III.  Discussion

### A.    Standard of Review

Review of the Commissioner's decision denying a claimant's application for social security disability benefits is limited to determining whether the factual findings of the final decisionmaker are supported by substantial evidence in the record.  *See* 42 U.S.C. § 405(g); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial in this context is "more than a mere scintilla of evidence but may be less than a preponderance." *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988) (citation omitted).  Put more pointedly, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  In an adequately developed record, this can mean "something less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent [ALJ Riley's decision] from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n.*, 383 U.S. 607, 620 (1966) (citations omitted).

Under this deferential standard, "[f]actual findings which are supported by substantial evidence must be upheld." *Ficca v. Astrue*, 901 F. Supp. 2d 533, 536 (M.D. Pa. 2012) (citations omitted); 42 U.S.C. § 405(g). This court's role is not to reweigh the evidence and make factual determinations, but to simply review the record and ensure that the ALJ provided "a discussion of the evidence and an explanation of reasoning for his conclusion sufficient to enable meaningful judicial review." *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500, 504 (3d Cir. 2009) (citations and quotations omitted). An ALJ meets that standard by stating "in his decision which evidence he has rejected and which he is relying on as the basis for his finding." *Schaudeck v. Comm'r of SSA*, 181 F.3d 429, 433 (3d Cir. 1999) (citations omitted). Moreover, when there is countervailing evidence, an ALJ must "give some reason for discounting the evidence he rejects." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (citation omitted); *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (holding that substantial evidence standard is

unmet when ALJ fails to resolve conflicts created by countervailing evidence).

Here, ALJ Riley's factual findings were supported by substantial evidence in the record, and the reasoning underlying those conclusions was sufficiently articulated to permit judicial review.

## B. Assessment of Treating Source Opinions in the Formulation of Residual Functional Capacity

Fry first contends that ALJ Riley erred in his evaluation of the favorable medical opinions provided by treating physicians Drs. Anderson and Stetler.  Fry argues that the ALJ did not provide a sufficient explanation concerning the supportability and consistency of these opinions in finding that they were partly persuasive and unpersuasive, respectively.  Doc. 8 at 3–14.  As set forth below, the ALJ's evaluation of the persuasive value of these two opinions sufficiently assessed their supportability and consistency, and his findings regarding each are supported by substantial evidence.

When evaluating a medical opinion, an ALJ is required to assess the level of support and consistency the opinion has against the record. 20 C.F.R. § 404.1520c.  Supportability "increases as the relevance of the objective medical evidence and explanations presented by the medical

source increases." *Vellone v. Saul*, 2021 WL 319354, at \*6 (S.D.N.Y.
2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y.
2021) (citing 20 C.F.R. § 404.1520c(c)(1)).  The consistency assessment
is "an all-encompassing inquiry focused on how well a medical source is
supported, or not supported, by the entire record." *Clay v. Kijakazi*,
2022 WL 13989015, at \*3 (N.D. Miss. 2022) (quoting 20 C.F.R.
§ 404.1520c(c)(1)).

Since an ALJ's duty of articulation requires just "some indication"
of their consideration of probative evidence, *Burnett*, 220 F.3d at 121,
an ALJ's assessment of a medical opinion's consistency and
supportability "need not discuss every piece of evidence in the record,"
and instead simply requires the building of "an accurate and logical
bridge between the evidence and the result." *Gamret v. Colvin*, 994 F.
Supp. 2d 695, 698 (W.D. Pa. 2014) (quotation omitted) (citations
omitted).  Further, in assessing whether an ALJ has provided an
adequate analysis for rejecting or accepting an opinion, the court must
look to the opinion as a whole, not only the part directly addressing the
particular opinion.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir.
2004) ("the ALJ's decision, read as a whole, illustrates that the ALJ

considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any listing[.]").

The sufficiency of an evaluation turns on the extent to which its reasoning is driven by an ALJ's read of the evidence—and the court's ability to discern that evidentiary reasoning. *See, e.g., Price v. Astrue*, 401 F. App'x 985, 986 (5th Cir. 2010) ("The ALJ does not need to comment on every piece of evidence, but only must build an accurate and logical bridge between the evidence and the final determination.") (citing *Glomski v. Massanari*, 172 F. Supp. 2d 1079, 1082, (E.D. Wis. 2001)); *Acosta Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, at *15 (S.D.N.Y. 2021), *report and recommendation adopted sub nom.*, 2022 WL 717612 (S.D.N.Y. 2022) ("[t]he ALJ must provide a reviewing Court with a sufficient explanation to ensure that they have complied with the legal procedures controlling their decision and cannot ignore or mischaracterize evidence.").

### 1. *Dr. Anderson's Opinion*

Dr. Anderson performed a consultative examination of Fry on September 9, 2023.  Tr. 782.  Relevantly, as explained by the ALJ, Dr. Anderson found that Fry:

has no useful ability to function in performing activities within a schedule, working near others without distraction, responding appropriately to changes in the work setting and traveling in unfamiliar places; is able to perform satisfactory some of the time in remembering locations and work like procedures, maintaining attention and concentration for extended periods, sustaining an ordinary routine, making simple work relate decisions, completing a normal workday or week, performing at a consistent enough pace and setting realistic goals; is satisfactory most of the time in understanding and remembering simple and detailed instructions, carrying out detailed instructions, interacting appropriately with the public, asking simple questions, responding appropriately to criticism from supervisors, getting along with coworkers and maintaining socially appropriate behavior; and has no limitation in carrying out simple instructions or adhering to basic standards of neatness. This provider indicated that the claimant's symptoms would cause him to miss work more than two (2) days per month (Exhibit 16F). On July 20, 2020, this provider indicated that the claimant has no useful ability to function in maintaining attention and concentration for extended periods, performing activities within a schedule, completing a normal workday or week, performing at a consistent pace, responding appropriately to changes in the work setting, traveling in unfamiliar places and setting realistic goals; is able to perform satisfactorily some of the time in understanding and remembering detailed instructions, working without distraction, making simple work related decisions and asking simple questions; is able to perform satisfactorily most of the time in carrying out detailed instructions, sustaining an ordinary routine, interacting appropriately with the public, accepting criticism from supervisors, getting along with coworkers, maintaining socially appropriate behavior, adhering to basic standards of neatness and being aware of hazards in the work place; and no limitation in understanding, remembering or carrying out instructions (Exhibit 12F). This provider indicated that

symptoms would cause the claimant to miss work more than two (2) days per month (Exhibit 12F).

*Id.* at 27–28.  However, while the ALJ

recognize[d] that these opinions were rendered by the claimant's psychiatric provider and agrees with the findings of ability to perform satisfactorily most of the time and no limitation, the findings of no useful ability to function and ability to perform satisfactorily some of the time to the extent that they are suggestive of an inability to perform that task at a competitive level and the findings of absences to the extent that they are suggestive of an inability to perform a competitive level of work are *not supported by* the absence of documentation of inpatient psychiatric hospitalization, participation in a partial hospitalization or intensive outpatient program or emergency treatment for uncontrolled mental health symptoms, the fact that the claimant on several occasions did not want to take medications recommended by the psychiatric provider to bring about improvement in his symptoms and reported failing to fill prescriptions by that provider, the claimant's reports to his primary care provider during the summer of 2020 that supplements recommended by the psychiatric provider seem to help a lot such that he hardly has been using Diazepam, the aggravating role that situational stressors may have played with regard to the claimant's symptoms, notes of treatment from the claimant's psychiatric provider indicating that the claimant's attention has been good, his concentration has been fair or good and his memory has been intact aside from August 18, 2020 when his concentration was described as poor and the claimant's abilities to attend a gathering with his radio group, to go to the beach, to care for family members' dogs and to be active with the church community.  For these reasons, these opinions are partially persuasive.

*Id.* at 28 (emphasis added).

More specifically, in evaluating Dr. Anderson's findings, ALJ Riley concluded that they were "partially persuasive," specifically crediting those portions regarding Fry's "[in]ability to function in performing activities within a schedule, working near others without distraction, responding appropriately to changes . . . and traveling in unfamiliar places; . . . remembering locations and work . . . procedures, maintaining attention and concentration . . . , sustaining an ordinary routine, making simple work relate decisions, completing a normal workday or week, [and] performing at a consistent enough pace and setting realistic goals." *Id.* at 27.

At the same time, the ALJ concluded that Dr. Anderson's conclusions regarding Fry's "inability to perform . . . at a competitive level" unpersuasive due to lack of "documentation of inpatient psychiatric hospitalization" or "a partial hospitalization or intensive outpatient program or emergency treatment"; unwillingness and failure to "take medications" and "fill prescriptions";[4] Fry's admission that "he hardly has been using Diazepam";[5] presence of "situational stressors";

---

[4] Based on Exhibit 8F. *Id.* at 21–22.

[5] Based on Exhibit 8F. *Id.* at 22.

and psychiatric treatment notes observing attention and memory and improvements.[6]  *Id.* at 28.  ALJ Riley also noted Fry's "abilities to attend a gathering with his radio group, to go to the beach, to care for family members' dogs[,] and to be active with the church community."[7]  *Id.*  This evaluation of Dr. Anderson's opinion, challenged by Fry now on appeal, sufficiently discussed the evidence and was reasonably articulated to permit meaningful judicial review.

The ALJ set forth his evidence-based reasoning for deeming unpersuasive those portions of Dr. Anderson's opinion concerning Fry's inability to perform work-related functions competitively.  More specifically, ALJ Riley explained that Fry's examination and clinical history did not support Dr. Anderson's opinions on those factors.  *Id.*

In support of that conclusion, ALJ Riley alluded to several exhibits, *id.* at 405, 414–15, 992, 1025, 1075, 1114, 1201, 1205–09, 1301, without precise details concerning their relevance; an approach that Fry deems insufficient.  Doc. 8 at 12–14.  Although those characterizations bear an element of truth, and the ALJ's analytical approach does not

---

[6]  Based on Exhibit 8F.  *Id.* at 20.

[7]  Based on Exhibits 3E, 4E, 9F, 10F, 14F, and 15F.  *Id.* at 17–18, 21.

engender *effective* judicial review, it does not thwart *meaningful* judicial review.  "A written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence.  Moreover, the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it." *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) (internal citation omitted).  Here, a review of the cited evidence of record supports the ALJ's conclusions on the consistency and supportability of Dr. Anderson's opinions.

Dr. Anderson's mental examination record contains several observations that Fry uses in asserting that ALJ Riley erred.  For example, on June 9, 2020, the treating physician found that Fry reported "high depression," "anxiety," and "guilt."  Tr. 1167.  The physician consequently contained a "Crisis Plan," which involved "de[]escalation techniques to assist [Fry] in regaining emotional control" and relevant contacts.  *Id.* at 1168.  On December 8, 2020, Dr. Anderson noted that Fry may be "unable to meet current goal due to an increase of anxiety."  *Id.* at 1172.  Further, on April 5, 2021, Fry reported that

his anxiety was "at 7/10 and his depression at 7/10"; and exhibited "indecisive" speech, depression, and bluntness. *Id.* at 1162.

Though ALJ Riley did not address these medical findings in the section of his opinion deeming a portion of Dr. Anderson's opinion unpersuasive, he did review them elsewhere in the opinion. Regarding the note dated June 9, 2020, Dr. Anderson noted that Fry's "attention appeared good and his concentration appeared fair (Exhibit 13F)." *Id.* at 18. Dr. Anderson qualified the finding of December 8, 2020, with the observation that, "although the claimant reported to his psychiatric provider experiencing increased depression and anxiety, he indicated that he did not want any medication changes (Exhibit 13F)." *Id.* at 22. As for the record of April 5, 2021, Dr. Anderson noted that, "while the claimant reported feeling stressed over COVID-19, he reported that therapy [wa]s helpful (Exhibit 13F)." *Id.* at 23. The ALJ further corroborated his summaries of medical evidence with appropriate citations. *Id.* at 18, 22, 23.

As Dr. Anderson's examination findings contain an evidentiary basis for concluding that Fry's mental impairments were not as deliberating as he claims them to be, and the treatment evidence shows

that Fry had shown improvements in his mental facilities, ALJ Riley's determination that Dr. Anderson's findings were but partially unpersuasive was anchored in the record. By citing that record evidence accordingly, the ALJ sufficiently built a bridge between the evidence and his result. *See Gamret*, 994 F. Supp. 2d at 698; *Jones*, 364 F.3d at 505.

As the Court is obliged to review the totality of the administrative decision when assessing the adequacy of an ALJ's analysis, *Jones*, 364 F.3d at 505, ALJ Riley's articulation of the medical evidence throughout the opinion does not warrant remand simply because that analysis was not reiterated in the specific section of the opinion deeming Dr. Anderson's findings partially persuasive.

Fry's contention that alternative evidence in the record supports and is consistent with Dr. Anderson's opinion, and thus undermines ALJ Riley's conclusion, is unavailing. "A written evaluation of every piece of evidence is not required," *Phillips*, 91 F. App'x at 780 n.7, "and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo*, 383 U.S. at 620.

In essence, Fry asks the Court to reweigh the evidence in his favor. "Courts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Since ALJ Riley assessed the weight of the evidence and cited to "such relevant evidence as a reasonable mind might accept as adequate to support" his conclusion concerning Dr. Anderson's opinion, *Pierce*, 487 U.S. at 565, Fry's disagreement with that determination does not warrant remand. Instead, the ALJ's evaluation is supported by substantial evidence in the record and is sufficiently articulated to permit judicial review, mandating affirmance. *See Gamret*, 994 F. Supp. 2d at 698; *Ficca*, 901 F. Supp. 2d at 536 ("Factual findings which are supported by substantial evidence *must* be upheld.").

### 2.    *Dr. Stetler's Opinion*

ALJ Riley's opinion included an evaluation of assessments that Dr. Stetler completed concerning Fry's mental abilities. ALJ Riley found Dr. Stetler's opinion partially persuasive. Tr. 29–30. More specifically, the ALJ observed that Dr. Stetler:

> indicated on February 16, 2022 that the claimant has no useful ability to function in understanding, remembering and

carrying out simple and detailed instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, sustaining an ordinary routine, making simple work related decisions, completing a normal workday and week, performing at a consistent enough pace, asking simple questions, responding appropriate to criticism from supervisors, responding appropriately to changes in the work setting, traveling in unfamiliar places and setting realistic goals; is able to perform satisfactorily some of the time in remembering locations and work like procedures, working near others without distraction, getting along with coworkers, maintaining socially appropriate behavior and being aware of normal hazards; is able to perform satisfactorily most of the time in interacting appropriately with the public and adhering to basic standards of neatness. This provider indicated that the claimant likely would miss work more than two (2) times per month due to symptoms and at least weekly would be required to miss work due to panic attacks (Exhibit 17F). On November 12, 2021, this provider indicated that the claimant is not able to make decisions or to work (Exhibit 19F). On September 10, 2021, this provider indicated that OCD prevents the claimant from performing simple household chores (Exhibit 19F). On March 5, 2021, this provider indicated that the claimant's depression renders him unable to work or to perform tasks (Exhibit 14F). On July 17, 2020, this provider indicated that the claimant has no useful ability to function in understanding and remembering detailed instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine, performing activities within a schedule, making simple work related decisions, completing a normal workday or week, performing at a consistent pace, accepting criticism from supervisors, responding appropriately to changes in the work setting and setting realistic goals; is able to perform satisfactory some of the time in remembering work like procedures, understanding, remembering and carrying out simple instructions, working without distraction, asking simple questions and getting along with coworkers; is able to

perform satisfactorily most of the time in carrying out detailed instructions, maintaining socially appropriate behavior, being aware of normal hazards and traveling in unfamiliar places; and has no limitation in interacting appropriately with the public or adhering to basic standards of neatness. This provider indicated that the claimant would miss work more than two (2) times per month due to symptoms (Exhibit 11F). On July 17, 2020, this provider indicated that the claimant is unable to meet the demands of any regular employment at this time with severely hampered ability to meet productivity standards, to manage conflict or to accept criticism and to work collaboratively (Exhibit 10F). On July 17, 2020, this provider indicated that difficulty regulating would make employment untenable (Exhibit 14F). On July 1, 2020, this provider indicated that the claimant could not sustain attention to perform work related tasks (Exhibit 14F). On June 26, 2020, this provider indicated that the claimant would be very suspicious of a supervisor at work (Exhibit 14F). On June 10, 2020, this provider indicated that the claimant would not be able to perform work duties (Exhibit 10F). On May 27, 2020, this provider indicated that the claimant would be unable to focus or function at a job (Exhibit 10F). On May 10, 2020, this provider indicated that work would be nearly impossible (Exhibit 10F). On April 24, 2020, this provider indicated that work virtually is impossible at this point (Exhibit 10F). On April 10, 2020, this provider indicated that depression and anxiety continue severely to impact the claimant's functioning (Exhibit 10F). On March 4, 2020, this provider indicated that the claimant would have extreme difficulty with a job (Exhibit 10F). On October 1, 2019, this provider and David Haynes-Weller, Psy.D., Dr. Stetler's supervisor, indicated that the claimant would be unable to hold a job due to his mental health symptoms (Exhibit 5F).

*Id.*

At the same time, ALJ Riley, based on supportability and consistency, determined that "the severity of symptoms reported by the claimant to this provider are not entirely consistent with the claimant's presentation at appointments during similar periods of time with his primary care provider." *Id.* at 30. For example, the ALJ noted that, while Fry "reported experiencing increased symptoms" to Dr. Stetler "during the summer and fall of 2021," he "appeared with a bright affect and engaged at appointments with his primary care provider on June 25, 2021 and October 4, 2021," to the point his "OCD appear[ed] to be very well controlled[.]" *Id.*; *see also id.* at 23 (citing Exhibit 15F). Further,

> [w]hile the undersigned agrees with the findings of ability to perform satisfactorily most of the time and no limitation in functioning, the findings of no useful ability to function and ability to perform satisfactorily some of the time to the extent that they are suggestive of an inability to perform the task at a competitive level and the findings that are consistent with an inability to perform a competitive level of work are *not supported by* the absence of documentation of inpatient psychiatric hospitalization, participation in a partial hospitalization or intensive outpatient program or emergency treatment for uncontrolled mental health symptoms, the fact that the claimant on several occasions did not want to take medications recommended by the psychiatric provider to bring about improvement in his symptoms and reported failing to fill prescriptions by that provider, the claimant's reports to his primary care provider during the summer of

2020 that supplements recommended by the psychiatric
provider seem to help a lot such that he hardly has been using
Diazepam, the aggravating role that situational stressors
may have played with regard to the claimant's symptoms,
notes of treatment from the claimant's psychiatric provider
indicating that the claimant's attention has been good, his
concentration has been fair or good and his memory has been
intact aside from August 18, 2020 when his concentration was
described as poor and the claimant's abilities to attend a
gathering with his radio group, to go to the beach, to care for
family members' dogs and to be active with the church
community.

*Id.* at 30.

As was the case for the opinion testimony provided by

Dr. Anderson, these contradictory observations were based on several

documents in the record. *Id.* at 17–18, 20–22, 405, 414–15, 992, 1025,

1075, 1114, 1201, 1205–09, 1301. As the ALJ cited the aforementioned

record evidence, which supports his determination of discrepancies

between Dr. Stetler's mental examination findings and her conclusions,

his opinion contains a logical and accurate bridge between the evidence

and his conclusion. *See Gamret*, 994 F. Supp. 2d at 698.

Thus, contrary to Fry's assertion, the administrative decision

shows sufficient supportability and consistency. "A written evaluation

of every piece of evidence is not required," *Phillips*, 91 F. App'x at 780

n.7, "and the possibility of drawing two inconsistent conclusions from

the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo*, 383 U.S. at 620.  Thus, because ALJ Riley assessed the weight of the evidence and cited to "such relevant evidence as a reasonable mind might accept as adequate to support[]" his conclusion concerning the inconsistency of Dr. Stetler's mental assessments, Fry's disagreement with that determination does not warrant remand. *See Pierce*, 487 U.S. at 565.

In sum, ALJ Riley reasonably articulated his determination that Dr. Stetler's opinions were unpersuasive, on both supportability and consistency grounds.  That conclusion, supported by substantial cited evidence, permits meaningful judicial review and should be affirmed.

### C.    Residual Functional Capacity Formation

Fry's second challenge is that ALJ Riley did not provide sufficient limitations in his residual functional capacity to account for his mental impairments.  Doc. 8 at 14–15.  Fry avers that he lacks "an RFC for work at any exertional level." *Id.* at 14.  The basis for this averment is that Fry's own "statements of his limitations due to his mental health conditions, as well as his treating doctors' opinions, are well-supported"—an assessment based on the extensive, unavailing

discussion of the treating physician opinion evidence discussed above. *Id.* Based on a reading of Bustin's testimony as implying that the proper residual functional capacity would preclude employment under any of the employer tolerances regarding being off task or absent, Fry concludes that he "is incapable of engaging in [substantially gainful activity]" and is 'disabled.'" *Id.* at 15. Put simply, Fry takes issue with the residual functional capacity defined by the ALJ. *See id.* But a review of the record reveals that those limitations are supported by substantial evidence, and that his residual functional capacity determination fully complied with applicable regulations.

In determining Fry's residual functional capacity, ALJ Riley concluded that he was limited to performing "medium work as defined in 20 CFR 404.1567(c)," save certain limitations. Tr. 19. Those limitations included the following:

> The claimant must avoid exposure to extreme cold, humidity, irritants and hazards such as heights and machinery. The claimant retains the mental capacity to perform simple, routine, repetitive tasks involving only simple work related decisions with few, if any, work place changes and to tolerate occasional supervision.

*Id.* ALJ Riley fashioned these limitations to accommodate Fry's alleged symptoms, at least to the extent that he found such alleged symptoms

supported by the evidence of record.  *Id.*  Fry, premising that these limitations are inadequate because supportability and consistency are but two of the five factors, essentially asks the Court to reweigh the evidence based on the other three factors.  Doc. 8 at 14–15; Doc. 16 at 1–3.

This alleged administrative error is nonexistent because, to the extent that Fry argues that the weight of the evidence supports greater limitations,[8] that contention fails under the regulatory framework.  If an ALJ's factual findings are supported by substantial evidence, the Court must uphold them.  *Ficca*, 901 F. Supp. 2d at 536; *see also Consolo*, 383 U.S. at 620 ("[S]omething less than the weight of the evidence, . . . does not prevent [it] from being supported by substantial evidence.").  Thus, if *some* evidence supports one of ALJ Riley's findings, then all he needs do to comply with the substantial evidence standard is state "which evidence he has rejected and which he is relying on as the

---

[8]  Fry, citing Page 105 of the record, asserts that Bustin testified that, "if the Claimant is off task for more than 10%-15% of the day, or is absent 1.5 days or more per month from work, or needs to take an unscheduled break (i.e., beyond two 15 minute breaks and a 30 minute break mid-shift), he would be unemployable."  Doc. 8 at 15 (citation and emphases omitted).  This contention misreads the record, which indicates that the vocational expert merely stated that "[e]mployers will tolerate only up to 10, 15% off task of work time[,] *depending on employer and occupation.*"  Tr. 105 (emphasis added).

basis for his finding." *See Schaudeck*, 181 F.3d at 433. That is precisely what ALJ Riley did here, when he laid out the objective evidence relevant to assessing Fry's statements concerning the limiting effects of his symptoms, and then assessed the credibility of the statements by comparing the two.

Although Fry may disagree with the ALJ's conclusions, his assessment of his symptoms was supported by a large quantity of evidence. *See* Tr. 17–18, 20–22, 405, 414–15, 992, 1025, 1075, 1114, 1201, 1205–09, 1301. In addition, after surveying this evidence, the ALJ thoroughly explained his reasons for rejecting Fry's statements regarding the limiting effects of his symptoms in favor of the relevant objective evidence in determining his limitations. *Id.* at 18–18, 20–22. As such, ALJ Riley's limitation findings, insofar as they are based on this comprehensive credibility assessment, must be upheld. *See Ficca*, 901 F. Supp. 2d at 536; *Schaudeck*, 181 F.3d at 433; *Diaz*, 577 F.3d at 506.

Accordingly, as a review of ALJ Riley's opinion shows that his limitation findings were based on substantial record evidence, and the reasoning underlying those findings was sufficient to enable judicial

review, they will not be disturbed. *See Ficca*, 901 F. Supp. 2d at 536;

*Diaz*, 577 F.3d at 506.

### D.  Assessment of Limitations Provided by Treating Sources in Step Five Analysis

Fry's third and final challenge is that ALJ Riley provided to

Bustin improper limitations in his residual functional capacity for his

allegedly severe impairments.  Doc. 8 at 16–18.  Specifically, Fry avers

that Drs. Anderson and Stetler opined that Fry has several limitations

that would preclude him from substantial gainful activity.  *Id.* at 16–17.

Asserting that these limitations conflict with Bustin's testimony, Fry

contends that the ALJ neither "clearly indicate[d] whether he credited

such opinions or not," nor "address[ed] these limitation opinions in any

hypothetical question" to Bustin.[9]  *Id.* at 17.  Citing *Cotter v. Harris*,

642 F.2d 700 (3d Cir. 1981), which, according to Fry, stands for the

proposition that "[a]n ALJ must explain when s/he rejects certain

evidence or when there are conflicts of interest," Fry surmises that ALJ

---

[9] Fry contends that the Appeals Council instructed ALJ Riley to address "these limitation opinions in any hypothetical question to the VE – something the Remand Order also required."  Doc. 8 at 17.  But a review of the remand order, Tr. 161–63, fails to reveal an instruction requiring the ALJ to address such limitations "in any hypothetical question" to Bustin.

Riley's "failure to articulate" the reasons for accepting or rejecting certain parts of the treating opinions warrants a remand. Doc. 8 at 17.

In assessing whether the objective medical evidence shows the existence of an alleged impairment, the ALJ "may properly accept some parts of the . . . evidence and reject other parts, but she must consider all the [probative] evidence and give some reason for discounting the evidence she rejects." *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994). This, importantly, does not mean that the ALJ must undertake an exhaustive discussion of *all* of the evidence. *See Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004) ("There is no requirement that the ALJ discuss in her opinion every tidbit of evidence included in the record."); *Beety-Monticelli v. Comm'r of Soc. Sec.* 343 F. App'x 743, 747 (3d Cir. 2009) ("[The ALJ] need not mention every piece of evidence in the record.").

A corollary is that a hypothetical submitted to the vocational expert need not include "every impairment alleged by a claimant." *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005) (emphasis omitted). Instead, "[a] hypothetical question must reflect all of a claimant's impairments that are supported by the record." *Chrupcala v.*

*Heckler*, 829 F.2d 1269, 121276 (3d Cir. 1987).  That is, the conveyed

impairments "encompass only those that are medically established."

*Rutherford*, 399 F.3d at 554 (citation and footnote omitted).

Here, ALJ Riley properly discussed the limitations that were

provided by Drs. Anderson and Stetler but discounted by the ALJ before

providing the residual functional capacity to Bustin.  Fry cites three

limitations that the ALJ failed to address: (1) the lack of "ability to

sustain an ordinary work routine without special supervision, or

perform work at a consistent pace, but only for 1/3 of the workday"; (2)

"no . . . ability to accept instructions from and respond appropriately to

criticism from supervisors"; and (3) inability to "get along with co-

workers and peers."  Doc. 8 at 16 (citations omitted).

Though Fry may disagree with ALJ Riley's conclusions, the ALJ's

assessment of his symptoms was supported by a substantial quantity of

evidence.  *See* Tr. 17–18, 20–22, 405, 414–15, 992, 1025, 1075, 1114,

1201, 1205–09, 1301.  As such, ALJ Riley's limitation findings, insofar

as they are based on the formidable administrative findings, must be

upheld.  *See Ficca*, 901 F. Supp. 2d at 536; *Schaudeck*, 181 F.3d at 433;

*Diaz*, 577 F.3d at 506.

Alternatively, to the extent that Fry argues that the weight of the evidence supports greater limitations, that contention also fails.  If an ALJ's factual findings are supported by substantial evidence, the Court must uphold them.  *See Ficca*, 901 F. Supp. 2d at 536; *see also Consolo*, 383 U.S. at 620.  Thus, assuming *some* evidence supports one of ALJ Riley's findings, then all he need do to comply with the substantial evidence standard is state "which evidence he has rejected and which he is relying on as the basis for his finding."  *See Schaudeck*, 181 F.3d at 433.

Accordingly, as a review of ALJ Riley's opinion shows that his limitation findings were based on substantial record evidence, and the reasoning underlying those findings was sufficient to enable judicial review, they will not be disturbed. *Ficca*, 901 F. Supp. 2d at 536; *Diaz*, 577 F.3d at 506.

## IV.  Conclusion

Accordingly, the Court affirms the Commissioner's decision.  A separate order shall be issued.

Date:  February 3, 2026         *s/ Phillip J. Caraballo*
                               Phillip J. Caraballo
                               United States Magistrate Judge